Roy U. Smith, petitioner,

*v.*

Frances B. Smith, defendant.

[Decided October 29th, 1923.]

Evidence examined, and *held* to sustain the charges of the petitioner of the adultery of the defendant.

On final hearing on petition for divorce.

*Mr. Merritt Lane* and *Mr. William W. Evans,* for the petitioner.

*Messrs. Ward & McGinnis,* for the defendant.

*Mr. Wood McKee,* for James J. Donnelley, corespondent.

Lewis, V. C.

This is an action for divorce on the ground of adultery. The answer is a denial and an attempt is made to show extreme cruelty; but I am unable to discover a scintilla of evidence to sustain such a charge. Moreover, extreme cruelty is not a defense to adultery. The defense does not attempt to show condonation. The case took about a week to try and there is a great mass of testimony. Several of the witnesses,

sworn in behalf of the petitioner, were close and intimate social friends of both the petitioner and defendant for many years. They attended the same social functions and were well acquainted with them. They maintained their friendship for both until they obtained knowledge of the misconduct of the defendant with the co-respondent, Donnelley. Most of these witnesses are well known residents of Paterson and are of unquestioned integrity. It is quite evident that some of them were extremely loth to testify against the defendant.

The petition filed by the husband names two co-respondents, Harry E. Pearsall, of Boston, Massachusetts, and James E. Donnelley, of Paterson, New Jersey. The time fixed for wrong-doing between Pearsall and the defendant is August, 1918, at the home of Mrs. Pearsall, the co-respondent's stepmother, at Oxford. Mrs. Frances B. Smith, the defendant, was a visitor at the Pearsall home at this time with Mr. and Mrs. William H. Smith, her father-in-law and mother-in-law, and Pearsall was also visiting there. It appears from the testimony of Pearsall, who is a married man, having a wife living in Boston, Massachusetts, and from the testimony of Mr. and Mrs. William H. Smith, that the defendant and Pearsall grew very friendly and intimate almost immediately upon meeting one another. Pearsall stayed at his stepmother's home for several days. His explanation of his visit there is that he came to settle up a small estate left by his father; but it appears that he only made one visit during his stay to the lawyer of the estate. He found time, however, in addition to taking out the defendant with the other parties at his stepmother's home, to take her out on a trip alone to a country fair. His explanation for taking her alone on this trip was that he found her so agreeable. Mr. and Mrs. William H. Smith, the father-in-law and mother-in-law, testified that after they had retired at night, at about eleven o'clock, they left Pearsall and the defendant downstairs in the house, and that on two nights after they had gone to their bedroom they heard someone tiptoeing from Pearsall's room in the direction of the defendant's bedroom. These

witnesses heard the defendant and Pearsall come upstairs together and heard Pearsall go to his room, which adjoined theirs. It was only a few minutes afterwards that they heard him going through the hall toward the defendant's room. It was a very soft tread, they avow, and that he stopped at the defendant's room, for there was no other place to go. The defendant's room, from the diagram produced, appears to have been in the front of the house and there was nothing else in this locality. They discussed the matter, but did not tell the petitioner of it until after the occurrence of November 19th, 1921, in the Blue home.

This proof standing alone I, of course, would not be willing to accept as satisfactory to establish a charge of adultery, although the testimony as to the conduct of the defendant and Pearsall at the Oxford home shows them to have been on terms of greatest familiarity and friendship and ample opportunity was there offered for the commission of the offense.

William H. Smith, among other things, tells of finding Pearsall and the defendant in the bathroom on one of the mornings after the night he heard Pearsall go into Mrs. Smith's room. Pearsall was in the bathroom and the defendant in the doorway. The co-respondent was dressed and the defendant had on a kimona. He says that he said to the defendant, "are you crazy?" And she replied, "it is none of your business what I do."

The evidence discloses a continuation of the friendship and relationship between Pearsall and the defendant. After the meeting at the Oxford home they met in New York on various occasions and had luncheon and dinner together—they say in company with a Mrs. McGee. They danced together on these occasions. The defendant says that she told her husband she was going to meet Pearsall in New York; but he denies having any knowledge of their meetings. All agree that he never met Pearsall, and, strange to say, according to Pearsall and the defendant, it appears that all the appointments made for meetings between them were through Mrs. McGee. Pearsall, in his testimony, says that he never

met Smith, the petitioner, and never telephoned to the defendant to make appointments. He knew that she had a telephone at her home and could readily have been reached by him in this way.

Mrs. McGee, who arranged all the meetings between the defendant and Pearsall, was not called as a witness. It is alleged that she is a resident of New York state; but, from the testimony of the defendant, it is shown that she was on terms of intimacy with her at the time of this trial. In fact, she testified that Mrs. McGee had recently visited her in Paterson and that she had been on a long automobile ride with her. The defendant could, without doubt, have procured her attendance at the hearing and her testimony would have thrown some light on these clandestine meetings of Pearsall, the married man from Boston, and the defendant. The defendant's explanation of their meetings, which were had, as is apparent, without the knowledge of Pearsall's wife or the defendant's husband, is entirely unsatisfactory and I cannot but conclude, under all the circumstances, they were for guilty purposes.

Now, relating back to the testimony of Mr. and Mrs. Smith, father-in-law and mother-in-law, I believe they told the truth as to the relationship between Pearsall and the defendant at the Oxford home. Their evidence of what happened there, together with the further testimony of secret meetings in New York, are to my mind sufficient to warrant the court in finding that Pearsall and the defendant were guilty of the charge contained in the petition.

The charges against the co-respondent, Donnelley, are sustained by convincing evidence. A large number of witnesses have testified to having seen the defendant and Donnelley together under circumstances which preclude the belief that their meetings were innocent and for innocent purposes. I do not need now to give the names of all the parties who have appeared as witnesses in this action and have testified to having seen them together. Evidence is offered to show that they were at Asbury Park together, and at one time, while the petitioner was absent, it appears that Donnelley and the defendant went to the Allenhurst Club to a dance

in the evening.   They walked from Asbury Park to Allenhurst, along the boardwalk.   Frequently they were seen out in the automobile belonging to the husband of the defendant, and it is established, beyond peradventure, that this was without the knowledge of the petitioner.   The defendant testifies that she was in the habit of renting her husband's car to Donnelley to take out other young women.   Her explanation for doing this was that she wanted to get a little extra money, as her husband was not supplying her with sufficient funds, although it appears that he was liberal to her considering his earning capacity.   He allowed her $30 a week for household expenses, and, during the last year they lived together, he had given her besides that in the neighborhood of $730.   The story of renting her husband's car to Donnelley is absurd and, in my belief, was manufactured for the purposes of meeting the testimony of Edward Fairhurst as to the occurrence on December 4th, 1920.

The witness, Fairhurst, who is a young man of excellent reputation and a well known resident here, has known both petitioner and defendant for many years.   He says he was taking a horseback ride on an unfrequented road in the neighborhood of Warren Point on December 4th, 1920, and that, as he was passing through the woods to the Dunkerhook road, he saw the car of Smith, the petitioner, parked about twenty-five feet off the road.   In the car he saw the defendant and Donnelley on the back seat and they were embracing and kissing each other.   The defendant denies that she was in the car on this day and tells of meeting the co-respondent Donnelley, at the Young Women's Christian Association, on Ellison street, on that day and renting him the car to take out a young girl friend of his named Miss Myers.   Donnelley swears that this was the girl that Fairhurst saw him with on this occasion.

I am satisfied that Fairhurst tells the truth in this matter. His credibility is not impaired in any way and other circumstances corroborate his story.   Fairhurst, undoubtedly as an act of friendship, called up the defendant after the event and asked her to see him.   She came to his office and he spoke

to her in a most friendly manner, cautioning her against her conduct and the perils involved. She told him that it was none of his business; that she would look out for herself, and furthermore said: "If I am interfered with I will lie. I will stop at nothing and if this thing goes into court and any attempt is made to take those children away from me I will swear they are not Roy Smith's."

On the witness-stand the defendant endeavored to convey the impression that Fairhurst's charges against her on this occasion were prompted by jealousy on his part, as she says he had been in love with her before her marriage—had proposed marriage to her—and that subsequent to her marriage, almost every time they met, he had obnoxiously forced his attentions on her; all of which Fairhurst denies and which appears to be without the slightest foundation. If his attentions to her were obnoxious and offensive why should she have gone to his office after the occurrence on the roadside of December 4th, 1920, which Fairhurst has related? On the last day of the taking of the testimony a picture postal card, written by the defendant while she was away on a summer vacation to Fairhurst, was put in evidence, which reads as follows:

"Mr. Edward Fairhurst,
East 29th Street, nr. 14th Ave.,
Paterson, N. J.
Dear Eddie:
What do you mean by dolling off to Philly? Thought you were a busy man these days. Have you seen Roy? I am still here and apt to stay, but I really like it. Love.

(Signed) FRANCES."

This communication certainly doesn't indicate an unfriendliness towards Fairhurst. It was suggestd that it may have been written to Fairhurst, her husband's closest friend, for the purpose of keeping track of her husband's movements. It certainly stamps her story of her attitude toward Fairhurst as false. Her husband has entered a flat denial of her statement that she complained to him about Fairhurst's attentions.

Another charge against the defendant is laid on the night of November 19th, 1921. It is shown that she and Donnelley spent that evening together at the home of her sister, Mrs. Edna Blue. Her sister and her brother-in-law were at a dance that night at Pompton Lakes. Mrs. Smith, it is said, went to her sister's house to take care of her sister's baby. Donnelley, however, appeared upon the scene. Donnelley says that he came there that night in response to a letter signed by the defendant saying that she wanted to see him. The letter, he says, has been lost. The defendant says she saw the letter and thought someone was playing a practical joke. Andrew Blue, the brother-in-law of the defendant, arrived at home about eleven o'clock. When he reached there he found Donnelley in the house. There was an immediate row, the cause of which was not disclosed, as Blue was not put on the witness-stand, although he lives at this house with his wife, the sister of the defendant, in the city of Paterson. A Mrs. Marsden testifies that she called at the Blue house that night and that the defendant, Donnelley and herself spent the evening together partaking of light refreshments. The defendant says that Mrs. Marsden arrived first and stayed until Donnelley had gone. Blue, of course, knows whether Mrs. Marsden was there when he came home, and had the row with Donnelley; but he is not called as a witness. I am disinclined to believe that Mrs. Marsden spent the evening there. Why is it that an important witness such as Blue should be kept from the court when his presence and testimony, if Donnelley's visit to his sister-in-law was for innocent purposes, might have lead the court to another conclusion than that the object of the meeting on this November night was for wrong-doing. As aforesaid, there was an immediate row between Donnelley and Blue, and Donnelley was seen rushing from the house after Blue had entered. He was pursued by an elderly lady, who also was not produced. Donnelley admits on the witness-stand that Blue called him a dirty dog and acted like a wild man, and yet he claims that his visit that night was an entirely innocent one. A hasty examination of Donnelley's testimony, under

cross-examination, indicates clearly what was going on at the Blue home and sheds great light on his entire relationship with the defendant. When the information was conveyed to Smith, the petitioner, as to what had taken place at the Blue house on the night of November 19, 1921, he severed relationship with his wife and refused to live with her.

There is other testimony as to meetings between Donnelley and the defendant. One witness, Harry Burns, a crossing tender at the New York, Susquehanna and Western railroad, in the locality of the home of Donnelley and the defendant, says that he saw them repeatedly during the summer months of 1921 around eleven o'clock at night standing on the pathway between the crossing and the Broadway station, which is an unfrequented passageway at this hour of the night. He says they were very loving and were kissing each other. Rudolph Wiseman (a member of the bar in this state) testifies to having-seen the defendant and Donnelley going up the railroad tracks (New York, Susquehanna and Western railroad) towards Seventeenth avenue at eleven o'clock one night. This evening he had accompanied Smith, the petitioner, on a hunt for his wife, her absence from her home being unaccounted for on this occasion. He did not inform the petitioner at the time of his discovery because he felt delicate about doing so.

Thomas Spagnola, a fruit dealer with whom the defendant had dealt and who had a store near the New York, Susquehanna and Western railroad crossing at Park avenue, testified to having told the defendant that he has been informed that she was meeting Donnelley in that locality. James Wright testifies to having seen Donnelley and the defendant near the Smith home in an automobile about eleven o'clock at night, when he had left the petitioner downtown at a lodge meeting, and Walter L. Dunstan tells of seeing Donnelley and the defendant automobiling through Passaic city, and on one evening having seen them entering the Smith homestead through the kitchen door about eight-thirty. Smith, the petitioner, testifies that he never saw Donnelley at his home.

Donnelley is a single man and was not a friend of the petitioner, or even on terms of intimacy with him, and it does not appear that he was ever with the defendant when her husband was present. Rudolph Wiseman, the witness before mentioned, testified that Blue had told him that when he entered his home on the evening of November 19th, 1921, he found his sister-in-law and Donnelley in bed; but this testimony is objectionable and I have ruled it out and not considered it in reaching my conclusion. In fact, giving no consideration to all testimony objected to by the defendant's solicitors, I am lead, however, to the inescapable conclusion that the charge of adultery against the defendant and the co-respondent, Donnelley, has been proved.

There is other testimony affecting the defendant's conduct —one an occurrence in the United States hotel in Paterson, where a detective testified that he saw her in the restaurant at eleven o'clock at night with a tall, dark-haired man. They were having supper. This was on July 22d, 1922. He watched for them to come out; but at one o'clock, although they had disappeared from the restaurant, he had not seen them come out. An effort was made to have Mrs. Smith admit that she spent the night at the hotel, and, while admitting that she was in the restaurant, says she left there about eleven o'clock. The man with her was not her husband. No attempt was made to amend the pleading and there is no charge of adultery based on the meeting at this hotel.

Smith, the petitioner, is a silk salesman and a resident of Paterson. He is a young man of good character and standing. None of the witnesses had any charge of misconduct to make against him, save that an attempt was made by Mrs. Blue, the sister of the defendant, to show that he had made improper advances to her. It was quite apparent, however, that the object in view was to discredit him in the eyes of the court. She says that his attentions were objectionable to her, but admitted a continuation of friendship with him after she had found them so. It is my view that he was never guilty of any improper or ungentlemanly conduct toward her. There is, of course, no charge of adultery made

against him. His attentions to his sister-in-law were simply those arising from their relationship and there is a grave question in my mind as to whether he manifested any particular interest in her.

As before indicated, the attempt to convey the impression that Fairhurst was moved by jealousy in making his charge against the defendant has failed utterly. There is nothing whatever to indicate that he was lead to become an actor primarily in this matrimonial controversy for any other reason than his friendship for the petitioner and the defendant and his desire to avoid the very situation which has now come to pass.

An outstanding feature of this case is that so many witnesses, apparently within the defendant's control, who could throw light upon the situation have not been produced. Why is it that Andrew Blue, the defendant's brother-in-law, who drove Donnelley from his home (Blue's home) on the night of November 19th, 1921, is not produced; the old lady who chased Donnelley from the Blue residence that night; Mrs. McGee, friend of the defendant, who arranged the secret meetings between Pearsall and the defendant, and Miss Myers, who Donnelley says was in the car with him on the roadway on December 4th, 1920, the afternoon that Fairhurst swears positively that he saw the defendant with him. Why is it that none of them were called as witnesses? No explanation was given by the defense for their failure to bring them to court, nor is it apparent that any attempt was made to procure their attendance.

The petitioner is entitled to relief and a decree may be accordingly entered..